# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**CASA ARENA BLANCA LLC,**

        **Plaintiff,**

        **vs.**                                **Case No.  1:20-cv-00314-JCH-SCY**

**LADONNA KAY RAINWATER,
DECEASED, BY THE PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF, BARRY GREEN,
ESQ.,**

        **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 20, 2020, Plaintiff Casa Arena Blanca, LLC, ("Plaintiff" or the "Casa Arena") filed a *Motion to Compel Arbitration* (ECF No. 3), seeking an order under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, to compel Defendant Barry Green ("Defendant," "Green," or "the Estate") to arbitrate claims that he asserted against Plaintiff in the First Judicial District Court, New Mexico. Defendant requests that the Court deny the motion, or alternatively, permit the parties to conduct discovery and an evidentiary hearing regarding the making, enforceability, and validity of the alleged agreement to arbitrate. *See* Def.'s Resp. 22-23, ECF No. 7. The Court, having considered the motion, briefs, supplemental authority, argument, evidence, and applicable law, concludes that the motion to compel should be denied.

## I.      INTRODUCTION

On October 18, 2019, Barry Green, the personal representative of Ladonna Rainwater's estate, filed suit for wrongful death, negligence, joint and several liability, and punitive damages against Casa Arena and six other defendants in *Rainwater v. Casa Arena Blanca, et al.*, D-101-

CV-2019-02781. *See* State Court Compl., ECF No. 1-4.[1] According to the state court complaint, Ms. Rainwater was a patient of Casa Arena from November 7-24, 2016, after hospitalization for a coronary artery bypass grafting surgery. *See id.* ¶¶ 31-32. The Estate alleges that Casa Arena and the other state court defendants failed to properly care for Ms. Rainwater's incisions and failed to follow her doctor's instructions or notify her doctor or surgeon when her incisions showed signs of slough and infection. *See id.* ¶¶ 33-46. The Estate further asserts that on November 24, 2016, Ms. Rainwater was transferred to a medical center and received care for infection, sepsis, and altered mental status, and as a result of the medical conditions she suffered while in the state court defendants' care, she died on December 14, 2017. *See id.* ¶¶ 49-54.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On March 5, 2020, Casa Arena moved to compel arbitration in the state court case. *See* Notice of Withdrawal, ECF No. 1-5 at 2 of 4. The Estate filed a response in opposition to the motion. *See* Def.'s Ex. 1, ECF No. 7-1 at 1 of 34. Subsequently, on April 2, 2020, Casa Arena withdrew its motion to compel arbitration in state court "without waiving its right to request arbitration, or move to compel arbitration, at a future date." Notice of Withdrawal, ECF No. 1-5 at 2-3 of 4. On April 8, 2020, Casa Arena filed suit in federal court against Defendant Green to compel arbitration based on the FAA, 9 U.S.C. § 4. *See* Compl. 1, ECF No. 1. According to the federal court complaint, on November 21, 2016, Melanie Burris, Ms. Rainwater's daughter, signed an "Admission Agreement—New Mexico" (hereinafter "Admission Agreement") and a "Dispute Resolution Agreement" (hereinafter "Arbitration Agreement") as part of the admission packet. *Id.* ¶ 5.

---

[1] The other state court defendants are New Mexico Health Care I, LLC, Fundamental Clinical and Operational Services, LLC, Fundamental Administrative Services, LLC, Dave Fythen Armijo, Internal Medicine Specialists of Alamogordo, PC, and Ferial M. Abood, M.D. *See* State Court Compl., ECF No. 1-4.

The Admission Agreement stated it was between Casa Arena and "Melanie Burris ('Resident's Durable Power of Attorney for Health Care'/'Resident's Legal Guardian'/'Resident's Responsible Party' hereinafter collectively 'Representative')." Admission Agreement 1, ECF No. 1-1. According to the Admission Agreement, the "Representative may act in more than one capacity and will be bound by the applicable terms and conditions of this Agreement." *Id.* § I.4. The Representative affirmed all the information submitted was true, *id.* § I.1, and acknowledged that the Facility was relying on her representations to enter into the agreement and that she received and read the Admissions materials and handbook and understood that the documents were part of the Admissions Agreement, *see id.* § XVI.

The Arbitration Agreement stated it was "between Kay Rainwater ('Resident') and/or Melanie Burris ('Representative'), and Casa Arena Blanca ('Facility')." Arbitration Agreement 2, ECF No. 1-2. According to the Arbitration Agreement, the intent of the Facility, Resident, and Representative was to bind, among others, the Facility, the Resident, her successors, agents, heirs, "and any personal representatives, including the executor of his or her estate." *Id.* at 2-3. The Agreement explained that by signing it, "she does so on behalf of the resident and on his or her own behalf," meaning she was signing in "her 'representative capacity' (on the resident's behalf)" and in "her 'individual capacity' (on … her own behalf)." *Id.* at 6. The Arbitration Agreement further stated that the Representative signs because she "wishes to obtain care and services for the Resident who is a third-party beneficiary of the agreement between the Facility and the Representative." *Id.* It noted, "Our agreement to admit the Resident, like this Agreement to use the DRP [Dispute Resolution Program], therefore personally benefits the Representative as well as the Resident." *Id.*

The Arbitration Agreement states:

we want to be absolutely clear about the following important points regarding the DRP:

**YOUR ADMISSION TO THE FACILITY IS CONTINGENT ON YOU AND YOUR REPRESENTATIVE, IF ANY, ENTERING INTO THIS AGREEMENT TO PARTICIPATE IN THE DRP. BY CHOOSING TO HAVE DISAGREEMENTS RESOLVED THROUGH THE DRP, YOU WILL BE WAIVING THE RIGHT TO HAVE A JUDGE OR A JURY RESOLVE ANY SUCH DISAGREEMENT IN COURT. INSTEAD, IF THERE IS A DISPUTE BETWEEN US, IT WILL BE RESOLVED THROUGH THE DRP. THIS MEANS THAT, IF ALL ELSE FAILS, OUR DISPUTE WILL BE RESOLVED BY A DECISION BY AN ARBITRATOR INSTEAD OF A JUDGE OR A JURY.**

*Id.* at 2. The provision further said that they were agreeing to mutual arbitration, regardless of who makes the claim. *Id.* at 3. The Arbitration Agreement explained that the Admission Agreement was the foundation of the relationship between the Resident, her representative, and the Facility, and of all duties, responsibilities, and obligations between them. *Id.* The Arbitration Agreement incorporated the Admission Agreement and said it should be read together with the Admission Agreement. *Id.*

The Arbitration Agreement proceeded to explain how the DRP works, *id.* at 3-4, including what type of disputes would be subject to arbitration: "All serious disputes, regardless of their cause or legal basis, involving an individual resident (or an individual resident's representative, family, heirs, assigns, etc.) will be resolved through arbitration," *id.* at 4. It defined "serious dispute" as "a matter involving more than $10,000." *Id.* According to the agreement, each side selects an arbitrator and then the two selected arbitrators choose the third arbitrator. *Id.* at 5. For claims the value of which may be unclear, "the arbitrator will decide whether the claim qualifies for arbitration." *Id.* at 4.

The provision covering how to enforce the Arbitration Agreement states:

The arbitrator is required to apply and enforce the terms of this Agreement. To the fullest extent permitted by law, any disagreements regarding the applicability,

> enforceability or interpretation of this Agreement will be decided by the arbitrator and not by a judge or jury. If, however, one of us requests arbitration and the other refuses to arbitrate, it is possible that a court might be asked to require that we both live up to our agreement.

*Id.* at 5. As for the rules to follow in an arbitration, the agreement expressly said the Federal Arbitration Act governs and that the rules and procedures they would follow in arbitration are those of the Judicial Arbitration and Mediation Service ("JAMS"). *Id.* Although not explicitly set forth in the Arbitration Agreement itself, JAMS Rule 11(b) states: "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator" who "has authority to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Comprehensive Arbitration Rules & Procedures, ECF No. 1-3 at 7 of 16. The Arbitration Agreement additionally provided: "You may revoke this Agreement for any reason, or for no reason, by sending a written notice of revocation to the Facility's Administrator within three (3) days from the date on which you sign this Agreement." Arbitration Agreement 6, ECF No. 1-2.

Casa Arena filed a motion to compel arbitration in federal court on April 20, 2020. Pl.'s Mot., ECF No. 3. Green opposes the motion, arguing that Casa Blanca waived its right to enforce the Arbitration Agreement by withdrawing its motion in state court after the issues were briefed. Green also contends that there is no valid arbitration agreement because Ms. Burris lacked the necessary legal authority to bind Ms. Rainwater or her estate to the agreement, and that the Agreement is unenforceable and a procedurally unconscionable contract of adhesion. Def.'s Resp. 1, ECF No. 7.

### III.   LEGAL ANALYSIS

The FAA makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress's purpose in enacting the FAA was "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA created a body of federal substantive law establishing and regulating the duty to enforce arbitration agreements. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985).

Arbitration agreements, however, may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center, West, Inc. v.* Jackson, 561 U.S. 63, 68 (2010) (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). In applying state law, a court may not construe an arbitration agreement differently from how it otherwise construes non-arbitration agreements under state law. *Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). In enacting the FAA, Congress did not intend to force parties to arbitrate in the absence of an agreement, and therefore the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Id.* at 1286-87. When the parties dispute the existence of a valid arbitration agreement, the presumption in favor of arbitration disappears. *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002).

Courts generally will enforce agreements according to their terms, but arbitration under the FAA "is a matter of consent, not coercion." *Volt Info. Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 479 (1989). "[C]ourts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide

grounds for the revocation of any contract." *Gilmer*, 500 U.S. at 33 (internal quotations omitted). Courts generally apply state law on the formation of contracts to determine whether a party agreed to arbitrate a dispute. *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir.2006).

Under Section 4 of the FAA, a court may order the parties to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. When the making of an arbitration agreement is at issue, the court must proceed to the trial of that issue. *Id.* "This 'framework is similar to summary judgment practice': the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith." *BOSC, Inc. v. Bd. of Cty. Comm'rs of Cty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (quoting *Hancock v. Am. Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012)). On a motion to compel, the court must give the party opposing arbitration the benefit of all reasonable doubts and inferences. *See id.* When there are no genuine issues of material fact regarding the agreement to arbitrate, the court may decide the arbitration issues as a matter of law. *See id.* When material issues of fact exist, a trial on the existence of the agreement is warranted (by jury, if requested by a party). *See id.*

## IV.   ANALYSIS

As an initial matter, Casa Arena asserts that the FAA's interstate commerce requirement is satisfied. Defendant's response did not address this issue, so the Court finds the issue conceded. Consequently, Casa Arena established that the underlying transaction in this case involved interstate commerce. The Court will therefore turn to the contested issues.

## A.  Whether Casa Arena Waived its Right to Arbitration

A party may waive the right to arbitration. *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litigation*, 790 F.3d 1112, 1115 (10th Cir. 2015). The Tenth Circuit applies a six-factor test to determine if a party has waived the right to arbitrate:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

*Id.* at 1116 (quoting *Peterson v. Shearson/Am. Express, Inc.*, 849 F.2d 464, 467-68 (10th Cir. 1988)).

With respect to the first factor, Defendant contends that Casa Arena's actions hindered the Estate's ability to litigate the arbitration issue. In support, Defendant argues he requested Ms. Rainwater's complete medical record and admission paperwork three times (August 7, 2019, October 4, 2019, and November 5, 2019), but Casa Arena failed to produce them, and then Casa Arena failed to file an Answer to the state court complaint until February 24, 2020. In response, Casa Arena notes that it was not served with the state court complaint until January 23, 2020, despite that it was filed on October 18, 2019. *See* Pl.'s Reply 2 n.2, ECF No. 14. Contrary to Defendant's argument, the record shows that Casa Arena began asserting its arbitration rights shortly after litigation began. Although it withdrew the motion to compel arbitration in the state court action, Casa Arena did so before briefing was complete, before a hearing was held on the motion, and before the state court ruled on the issue. Six days after filing the notice of withdrawal in state court, Casa Arena filed its complaint to compel arbitration in federal court, and then filed

its motion to compel on April 20, 2020. Although Casa Arena decided it preferred a federal forum, the record does not show that Casa Arena's actions are inconsistent with the right to arbitrate. Factor one thus does not favor waiver.

As for the remaining factors, factors two and three favor a finding of non-waiver because Casa Arena had not substantially invoked the state court litigation machinery and the litigation had just begun when it moved to enforce its arbitration rights. Casa Arena's request to arbitrate was not filed close to trial. Defendant has not suggested that either factors four or five apply here. As for the sixth factor, there was not significant delay, nor evidence of prejudice stemming from any delay. The Court thus concludes that Plaintiff has not waived its right to arbitration, so the Court will consider the merits of the motion to compel arbitration.[2]

### B.  Whether the Court May Decide the Issues of Existence and Validity of the Arbitration Agreement

Defendant next contends that Ms. Burris lacked the legal authority to bind Ms. Rainwater or her estate to the Arbitration Agreement, and thus, no contract to arbitrate exists between the parties to this litigation. According to Defendant, the Court must decide this threshold issue of contract formation. Plaintiff, however, asserts that the Delegation Clause requires that arbitrability issues be determined by the arbitrator. Because Defendant's argument about Ms. Burris' lack of authority is directed to the Arbitration Agreement as a whole, rather than specifically to the Delegation Clause, Plaintiff contends that the Court cannot consider this argument.

---

[2] As part of its waiver argument, the Estate argues that Casa Arena excluded six other necessary and indispensable parties named in the state court litigation. Defendant has not convinced the Court that Casa Arena had to include all the state-court parties in this action. *See Taos NM Senior Living, LLC v. Trujillo by Green*, No. 1:18-cv-904-WJ-KBM, 2019 WL 1239858, at *7-9 (D.N.M. Mar. 18, 2019) (explaining why nursing home administrator and other business entities were not necessary and indispensable parties to federal court action brought by alleged joint tortfeasor seeking to enforce arbitration). While the proceedings suggest an attempt to forum shop, they do not establish waiver.

A "delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement." *Rent–A–Center*, 561 U.S. at 68. Parties may agree to arbitrate "gateway" issues of arbitrability, such as whether the parties agreed to arbitrate and the scope of any such agreement. *Id.* at 68-69. "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70.

The existence of an agreement to arbitrate is a threshold matter that must be determined before the FAA applies. *Avedon*, 126 F.3d at 1286-87. This Court must decide whether it has the authority to consider that question at all or if it is one for the arbitrator. The question of who has the authority to decide arbitrability depends on what the parties agreed regarding that issue. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017). When the parties agree that an arbitrator decides arbitrability, "they delegate to an arbitrator all threshold questions concerning arbitrability." including whether the agreement covers the dispute. *Id.* (citing *Rent-A-Center*, 561 U.S. at 68-69). When determining whether a party has agreed that arbitrators should decide arbitrability, courts do not assume the parties agreed to arbitrate arbitrability unless it is clear and unmistakable that they agreed to do so. *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (10th Cir. 1995)). The clear-and-unmistakable requirement pertains to the parties' intent, not the agreement's validity. *Rent-A-Center*, 561 U.S. at 69 n.1. A contract's validity refers to whether it "is legally binding, as opposed to whether it was in fact agreed to—including of course, whether it was void for unconscionability." *Id.*

Here, the Arbitration Agreement says that "any disagreements *regarding the applicability, enforceability or interpretation* of this Agreement will be decided by the arbitrator and not by a judge or jury." Arbitration Agreement 5, ECF No. 1-2 (emphasis added). The agreement also

provided that the arbitration "will follow the rules and procedures of the Judicial Arbitration and Mediation Service ('JAMS')." *Id.* JAMS in turn states that "*arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement* under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator" who "has authority to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Comprehensive Arbitration Rules & Procedures, ECF No. 1-3 at 7 of 16 (italics added). In *Belnap*, the Tenth Circuit clearly spoke on this issue, concluding that parties clearly and unmistakably agreed to arbitrate arbitrability when they incorporated JAMS Rules into their agreement. *Belnap*, 844 F.3d at 1281. The JAMS rule regarding arbitrability in *Belnap* is identical to the JAMS rule here. *See id.*

Defendant attempts to interject ambiguity by pointing to the language of the Arbitration Agreement saying that if one of the parties "requests arbitration and the other refuses to arbitrate, it is possible that a court might be asked to require that we both live up to our agreement." Arbitration Agreement 5, ECF No. 1-2. This Court is unconvinced this sentence creates confusion to overcome the plain meaning of incorporating JAMS rules that require an arbitrator to decide disagreements about arbitrability. Rather, the sentence merely accounts for the situation we have here – a party who seeks to enforce the agreement may have to ask a court to compel the parties to arbitrate. The Tenth Circuit made clear that incorporating JAMS rules in which arbitrability decisions are plainly decided by the arbitrator compels finding an intent to delegate. *Belnap* is controlling here.[3]

---

[3] Defendant's reliance on the recent opinion of *Hunt v. Rio at Rust Centre, LLC*, __ P.3d __, Nos. A-1-CA-37406, A-1-CA-37902, 2020 N.M. App. LEXIS 2 (N.M. Ct. App. June 11, 2020), is misplaced. In *Hunt*, the delegation clause merely said that any "disputes regarding the interpretation of this [a]greement shall be submitted to arbitration." *Id.* ¶ 15. *Hunt* did not involve a provision that incorporated the JAMS Rules, which expressly delegated arbitrability rules to the arbitrator, and is thus distinguishable from this case. *Belnap*, not *Hunt*, governs this Court's analysis.

In addition to challenging the conscionability of the agreement, Defendant challenges the formation of a contract at all that binds the Estate. At issue then is whether Defendant's attack on Ms. Burris' authority to enter the contract invalidates the delegation provision such that this Court cannot send the matter to an arbitrator because there was no arbitration agreement or delegation clause to which Ms. Rainwater agreed. Casa Arena argues that the argument must be given to the arbitrator because the argument challenges the contract as a whole, not specifically the delegation provision. Casa Arena relies on *Evangelical Lutheran Good Samaritan Society v. Moreno*, 277 F.Supp.3d 1191, 1228 (D.N.M. 2017), which in turn relied on *Rent-A-Center*, for the proposition that if the party seeks to enforce a delegation clause, the nonmoving party must challenge the delegation provision specifically, otherwise, the court must treat the delegation clause as valid and enforce it under the FAA. *See id.* at 1212 (quoting *Rent–A–Center*, 561 U.S. at 70).

In *Rent-A-Center*, the Supreme Court examined whether the district court could decide whether an arbitration agreement was unconscionable when the agreement explicitly stated the arbitrator shall have exclusive authority to resolve disputes relating to the interpretation, applicability, enforceability, or formation of the agreement, including whether the agreement was void or voidable. *Rent-A-Center*, 561 U.S. at 65-66. Because arbitration provisions are severable from the remainder of a contract, a party's challenge to the contract as a whole does not prevent a court from enforcing the arbitration agreement. *See id.* at 70-71. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Id.* at 71. Applying the severability rule, the Supreme Court explained that, unless the party challenges the delegation provision specifically, the court "must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Id.* at

72. Because the plaintiff's arguments concerning the unconscionability of the agreement were targeted to the arbitration agreement as a whole, and he did not make arguments particular to the delegation provision, the Supreme Court held that the court could not consider the merits of the plaintiff's unconscionability arguments. *See id.* at 73-76.

Likewise, here the Estate's arguments concerning procedural unconscionability target the agreement as a whole. The Estate contends that the Agreement's mandatory precondition of signing the arbitration agreement in order to receive admission and medical treatment into the nursing facility is procedurally unconscionable. This argument is not particular to the delegation provision. Accordingly, based on *Rent-A-Center*, the unconscionability challenge is for an arbitrator to decide based on the plain language of the delegation provision. The Court therefore cannot consider the Estate's arguments concerning unconscionability.

Nevertheless, the Estate also contends that Ms. Burris never had authority to enter the agreement on behalf of the Estate. The Supreme Court stated that the "issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006). In *Cardegna*, the Supreme Court declined to rule on whether lower court opinions were correct that held it is for the courts to decide whether the alleged obligor signed the agreement or whether the signor lacked authority to commit the purported principal. *See id.* The Supreme Court again in *Rent-A-Center* noted the difference, but it addressed only the issue of validity. *Rent-A-Center*, 561 U.S. at 70 n.2.

The Estate's argument that Ms. Burris lacked authority to sign for Ms. Rainwater is a question that goes to the Arbitration Agreement as a whole; it is not specific to the delegation provision. Nevertheless, *Rent-A-Center* and *Cardegna* indicate that the contract-formation

argument is separate from the validity argument. The initial question here is whether the Estate ever entered an agreement at all with Casa Arena to which it can be bound, and thus, *Rent-A-Center* and *Moreno*, upon which Plaintiff relies, are distinguishable. The Court finds that the question of whether any contract exists at all to bind the Estate is one for this Court and not the arbitrator. *See Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1104 (10th Cir. 2020) ("[A] delegation clause cannot be severed from an agreement that does not exist. Courts must therefore first determine whether an arbitration agreement was indeed formed before enforcing a delegation clause therein."); *MZM Construction Co., Inc. v. New Jersey Building Laborers Statewide Benefits Fund*, 974 F.3d 386, (3d Cir. 2020) ("Consistent with the Supreme Court's repeated admonition that, at its core, 'arbitration is a matter of contract,' *Rent-A-Center*, 561 U.S. at 67, 69, 130 S.Ct. 2772, we believe that the text of section 4 of the FAA—mandating that the court be 'satisfied' that an arbitration agreement exists—tilts the scale in favor of a judicial forum when a party rightfully resists arbitration on grounds that it never agreed to arbitrate at all. Indeed, it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute."). Accordingly, the Court will turn to the gateway question that it is permitted to consider – whether the Estate agreed to arbitrate.

### C.  Whether Ms. Burris had Authority to Enter Contract for Ms. Rainwater

State law governs questions of contract formation. *First Options*, 514 U.S. at 944. "For a contract to be legally valid and enforceable, it must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Heye v. American Golf Corp., Inc.*, 2003–NMCA–138, ¶ 9, 80 P.3d 495. A party may manifest her assent to an offer by written or spoken words or by other acts or failures to act. Restatement (Second) of Contracts § 19 (1981). The purpose of a

signature is generally to show mutuality or assent, but mutual assent can be proven in other ways, such as by conduct of the parties. *Integrated Health Servs. of Green Briar, Inc. v. Lopez–Silvero*, 827 So.2d 338, 339 (Fla.Dist.Ct.App.2002).

A wrongful death action is entirely derivative of the decedent's right to sue, so "a valid arbitration agreement signed by a competent party binds that party's estate and statutory heirs in a subsequent wrongful death action." *Estate of Krahmer ex rel. Peck v. Laurel Healthcare Providers, LLC*, 2014-NMCA-001, ¶ 1, 315 P.3d 298. It is undisputed that Ms. Rainwater did not sign the arbitration agreement, but rather, her daughter did. Because Ms. Burris was not appointed power of attorney until well after Ms. Rainwater left Casa Arena, Defendant contends that Ms. Burris did not have actual or apparent authority to bind Ms. Rainwater or her Estate to the agreement.

Whether Ms. Burris had authority to sign on her mother's behalf turns on agency law. The party asserting that an agency relationship existed bears the burden of showing such a relationship. *See Corona v. Corona*, 2014-NMCA-071, ¶ 22, 329 P.3d 701 (stating that a plaintiff seeking to impose liability on the principal for the acts of the agent bears the burden of demonstrating an agency relationship). Under New Mexico law, an agent "is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair[,] or does some service for the principal, with or without compensation." *Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 2011-NMCA-094, ¶ 16, 265 P.3d 720 (quoting *Tercero v. Roman Catholic Diocese of Norwich*, 2002-NMSC-018, ¶ 12, 48 P.3d 50). An agency relationship may be created orally or in writing. *See id.*

"Apparent authority arises from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties." *Id.* (quoting *Diversified Dev. & Inv., Inc. v. Heil*, 889 P.2d 1212, 1218 (N.M. 1995)). "Actual authority

is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship." *Id.* (quoting *Comstock v. Mitchell*, 793 P.2d 261, 264 (N.M. 1990) (Ransom, J., specially concurring)). The acts of an agent done within the agent's authority and the acts of an agent that the principal holds the agent out to the public as possessing bind the principal. *Id.* If a principal clothed the agent with the appearance of authority and that authority carries with it generally recognized duties, the principal will also be responsible for the agent's acts. *Id.*

According to Ms. Burris' affidavit, Ms. Rainwater made her own healthcare decisions and signed her own documents while she was in the hospital for heart surgery and when she was a patient at Casa Arena. *See* Burris Aff. ¶¶ 6-7, 21, ECF No. 7-2. Ms. Burris attests that no durable power of attorney, financial power of attorney, nor health care power of attorney was drafted or signed while Ms. Rainwater was a patient at Casa Arena. *Id.* ¶ 21. According to Ms. Burris' affidavit, Ms. Rainwater signed her own document for Advanced Directive to Limit EMS Care at Casa Arena, *id.* ¶ 22, and Ms. Burris was not asked to provide a power of attorney prior to being asked to sign the Arbitration Agreement, *id.* ¶ 23. Two weeks transpired between her admission, when evidence suggests Ms. Rainwater may have been able to execute decision-making authority for herself, and when Ms. Burris signed the admissions paperwork for her mother.

Based on the evidence in the record, Casa Arena has not demonstrated that Ms. Rainwater by express statements or implied actions held out Ms. Burris as her agent or that she had knowledge that Ms. Burris was making healthcare and other decisions for her. Nor has Casa Arena presented undisputed evidence indicating Ms. Rainwater appointed Ms. Burris as her agent. Casa Arena has therefore not met its burden of showing an agency relationship existed between Ms. Rainwater and Ms. Burris. *Compare Rosenquist v. Genesis Healthcare, LLC*, No. A-1-CA-36609, 2020 WL

16

2507655, ¶¶ 6, 18-19 (N.M. App. May 13, 2020) (unpublished opinion) (concluding defendants failed to meet their burden of showing decedent's wife was decedent's agent and that estate was bound by arbitration agreement that wife signed, but not decedent, where there was a lack of evidence of decedent's incompetence and only possible action indicating agency was his failure to deny her authority; but "principal cannot ratify a purported agent's acts through mere inaction unless the principal has full knowledge of the material facts concerning the transaction" and there was no evidence decedent had such full knowledge);[4] *Washburn v. Northern Health Facilities, Inc.*, 121 A.3d 1008, 1010-11, 1014-15 (Pa. Super. Ct. 2015) (affirming district court's ruling that wife did not have apparent or actual authority to bind husband to arbitration agreement in nursing home admission paperwork that she signed when she advised staff she did not have power of attorney for husband and there was no evidence husband by words or conduct authorized his wife to act on his behalf); *Ashburn Health Care Center, Inc. v. Poole*, 286 Ga. App. 24, 26-27 (2007) (concluding that no agency relationship existed between resident and her spouse where resident wife did not act in way to raise inference of agency, did not know about agreement, and did not authorize her husband to sign document); *with Barron*, 2011-NMCA-094, ¶¶ 1, 3-5, 17-20, 40 (explaining that decedent's general authorization for her granddaughter to complete her nursing home admission paperwork was sufficient to give her granddaughter authority to agree to arbitration where decedent explicitly told employee that her granddaughter would fill out admission paperwork on her behalf and arbitration agreement was part of admission paperwork).

### D. Whether the Third-Party Beneficiary or Equitable Estoppel Doctrine Binds Ms. Rainwater's Estate to the Arbitration Agreement

---

[4] Although non-precedential, such unpublished decisions may be cited for any persuasive value. *See* NM R RAP Rule 12–405(A).

Casa Arena nonetheless contends that third-party beneficiary and equitable estoppel law bind Ms. Rainwater to the Arbitration Agreement between Ms. Burris individually and Casa Arena. The Estate contends that neither third-party beneficiary nor equitable estoppel doctrines compel arbitration because (1) the New Mexico Supreme Court has never used the third-party beneficiary doctrine to enforce an arbitration agreement against a non-signatory; (2) Ms. Rainwater did not sign the document and Ms. Burris lacked actual or apparent authority to bind Ms. Rainwater or her Estate to the document; (3) the agreement conferred no benefit upon Ms. Rainwater; and (4) the agreement was not a single contract for admission.

### 1.   Third-party beneficiary doctrine

A third-party beneficiary of a contract may have an enforceable right against a party to the contract. *Fleet Mortg. Corp. v.* Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81. The party claiming to be a third-party beneficiary has the burden to show that the parties to the contract intended to benefit him. *Doña Ana Mut. Domestic Water Consumers Ass'n v. City of Las Cruces*, 516 F.3d 900, 907 (10th Cir. 2008). The intent to benefit the third party must appear from the contract itself or from some other evidence that the person claiming to be a third-party beneficiary was an intended beneficiary. *Fleet Mortg.*, 1991-NMSC-046, ¶ 4.

In this case, the Arbitration Agreement signed by Ms. Burris stated that she had the authority to make the agreement on behalf of the Resident, and that the Resident "is a third-party beneficiary of the agreement between the Facility and the Representative." Arbitration Agreement 6, ECF No. 1-2. The agreement expressly said that it "personally benefits the Representative as well as the Resident," because the Representative wants to obtain care and services for the Resident. *Id.* The contractual terms, thus, evince an intent to name Ms. Rainwater, the Resident, as a third-party beneficiary.

Generally, however, the third-party beneficiary doctrine applies when a non-signatory attempts to enforce the contract against a signatory. *Fleet Mortg. Corp.*, 1991-NMSC-046, ¶ 4. The New Mexico Court of Appeals applied the third-party beneficiary doctrine to an arbitration agreement when it held that a non-signatory to an arbitration agreement had a right to compel arbitration against a signatory to that agreement where the face of the arbitration agreement showed the parties' intent to grant to a class of entities, to which the non-signatory belonged, rights under the arbitration provisions. *See Rivera v. Am. Gen. Fin. Servs., Inc.*, 2010-NMCA-046, ¶¶ 20-22, 242 P.3d 351, *reversed on other grounds by* 2011-NMSC-033, 259 P.3d 803. What has not been resolved by the New Mexico appellate courts is whether and under what circumstances a signatory may compel a non-signatory to arbitrate under the third-party beneficiary doctrine. Nor is there clear authority out of other jurisdictions indicating that the weight of authority is to expand the doctrine. The Tenth Circuit noted the difference of opinion on this issue:

> There is a split of authority among the states regarding the binding effect of arbitration provisions on nonsignatory, wrongful-death heirs. "States that bind such plaintiffs generally view wrongful death claims as derivative of the decedent's claim, or focus on the public policy favoring arbitration agreements. States that do not bind claimants generally emphasize the independence of the wrongful death claim or the need for consent in creating binding arbitration." *Ruiz v. Podolsky*, 50 Cal.4th 838, 114 Cal.Rptr.3d 263, 237 P.3d 584, 591 n. 2 (2010) (citations omitted).

*THI of New Mexico Hobbs Center, LLC v. Spradlin*, 532 F. App'x 813, 817 (10th Cir. Sept. 20, 2013) (unpublished opinion).

In "New Mexico, as in Mississippi, Florida, Texas, and Michigan, a wrongful-death suit is a derivative action by the beneficiaries, and those beneficiaries, therefore, stand in the position of their decedent." *Id.* at 817 (internal quotation omitted). That an action by beneficiaries is derivative, however, does not settle the question of whether a state will bind the decedent and his or her estate to a contract based on third-party beneficiary law. At least one state, Florida,

concluded that the third-party beneficiary doctrine could not be used to bind a decedent's estate to an arbitration agreement when the estate was not suing on the contract. *See*, *e.g.*, *Mendez v. Hampton Court Nursing Center, LLC*, 203 So.3d 146, 149-51 (Fla. 2016) (refusing to extend third-party beneficiary doctrine to enable the nursing facility and signatory to an arbitration agreement in a nursing home admissions agreement to compel arbitration of the non-signatory resident whose estate was suing for negligence, not to enforce the contract). Some lower courts in this district have nonetheless applied the doctrine to compel a non-signatory to arbitrate, and it is upon these decisions that Plaintiff relies.

In *THI of New Mexico Hobbs Center, LLC v. Spradlin*, 893 F.Supp.2d 1172 (D.N.M. 2012), the decedent was admitted into the nursing home and, in connection with his admission, his daughter signed the admission contract that contained an arbitration agreement, and that same day, the decedent executed a power of attorney that appointed his daughter and son to serve as his attorneys-in-fact. *Id.* at 1176. The Honorable Martha Vázquez determined that whether the daughter signed as an attorney-in-fact or had an agency relationship with her father was irrelevant where she made no representation she was entering the agreement as his agent, and instead signed in her capacity of "Immediate Family Member." *See id.* at 1176, 1188. Instead, Judge Vázquez concluded that the decedent was a third-party beneficiary to and bound by the terms of the admission contract, including the arbitration agreement, because he was the named resident to be admitted to the facility, his care was the essential purpose of the contract, and he obtained the benefits of residency at the nursing facility for more than two years. *See id.* at 1188-89 (relying on *THI of N.M. at Hobbs Center, LLC v. Patton*, No. 11-537 LH/CG, 2012 WL 112216, at *8 (D.N.M. Jan. 3, 2012) (and cases cited therein)). The court, however, noted that the defendant never refuted

that the decedent was a third-party beneficiary of the admission agreement, so the court deemed the silence as a concession on the point. *Id.* at 1189 n.1.

In affirming, the Tenth Circuit also explained that the estate did not dispute before the district court the nursing facility's assertion that the decedent, despite not signing the contract, was bound by it as a third-party beneficiary. *See Spradlin*, 532 F. App'x at 816. Nor did the estate attempt to dispute the issue until filing its reply brief on appeal, so the Tenth Circuit did not consider the argument. *See id.* Instead, the appellant argued that, although the decedent was bound by the third-party beneficiary doctrine, the wrongful-death beneficiaries were not so bound. *See id.* The Tenth Circuit disagreed after concluding that the beneficiaries' claims were derivative of the decedent's claim. *See id.* at 817-18. Because the decedent was bound by the arbitration clause as a third-party beneficiary, the Tenth Circuit held that the wrongful-death beneficiaries were likewise bound. *See id. Spradlin* is of limited utility here because the parties assumed that the decedent was bound by the third-party beneficiary doctrine.

Turning then to *Pinnacle Health Facilities XXXIII, LP v. Crecca*, No. CIV 15-cv-01062 RB/LAM, 2016 WL 9818326 (D.N.M. Nov. 7, 2016), the district court therein examined whether a non-signatory to an arbitration agreement can be forced to arbitrate pursuant to the third-party beneficiary doctrine under New Mexico law. *Id.* at *1. In that case, a week after her husband's admission into a nursing care facility, the wife signed paperwork to admit her husband, who suffered from a stroke and dementia, but the facility never asked the wife for an official document that gave her power of attorney to sign a contract on behalf of her husband, and no such document existed. *See id.* at *1-2. The wife, however, had made healthcare decisions for her husband in the past. *Id.* at *2. After her husband died, his wrongful death estate filed suit against the facility, which moved to compel arbitration based on the arbitration agreement signed by the wife as part

of the admissions paperwork. *See id.* at \*1-2. The court determined that the wife did not have apparent authority to enter the contract on her husband's behalf because there was no evidence he made any manifestations to the nursing facility to demonstrate that he conveyed such authority to her, as required by New Mexico law, and it declined to determine whether she had actual authority. *See id.* at \*6-7. The *Pinnacle* court instead relied on the third-party beneficiary doctrine, looking to language in the arbitration agreement evincing an intent to benefit the resident; for example, language showing the benefit to the resident of faster resolution and minimized costs, including costs borne by the nursing facility. *See id.* at \*10. It then examined whether, as a third-party beneficiary, the resident could be compelled to arbitrate. *See id.* at \*10-11.

The *Pinnacle* court agreed with the conclusion of another District of New Mexico opinion, *THI of N.M. at Hobbs Center, LLC v. Patton*, No. 11-537 LH/CEG, 2012 WL 112216 (D.N.M. Jan. 3, 2012), in which the Honorable Judge C. LeRoy Hansen determined that the New Mexico Supreme Court would likely follow cases in other jurisdictions that extended the third-party beneficiary doctrine to compel arbitration under the following circumstances: when there is an underlying contract with a person signing on the resident's behalf, the non-signatory resident was named as the person receiving care from the nursing facility and was a third-party beneficiary of the contract whose primary purpose was the resident's care. *See Pinnacle*, 2016 WL 9818326, at \*10-11 (citing *Patton*, 2012 WL 112216, at \*8-9, and cases relied upon therein). In *Pinnacle*, the district court compelled arbitration because the husband was the intended beneficiary of the contract whose essential purpose was his care and he received care under the contract; he was aware his wife was making care decisions for him and did not object to his wife's decisions; and the wife signed the admissions contract as the responsible party and the arbitration agreement as his representative. *See id.* at \*11.

Plaintiff also relies on a few other District of New Mexico cases in which the courts compelled arbitration under the third-party beneficiary doctrine. *See Moreno*, 277 F.Supp.3d at 1196-98, 1232-33 (explaining in dicta that non-signatory decedent's estate was third-party beneficiary to arbitration agreement contained in admissions paperwork where court-appointed temporary legal guardian signed nursing home agreement on resident's behalf because language of admission agreement showed that signatories intended to benefit decedent; decedent was named resident; contract's clear purpose was to provide for her care; and decedent reaped benefits of that care); *THI of New Mexico at Vida Encantada, LLC, v. Lovato*, 848 F.Supp.2d 1309, 1314-15, 1326-27 (D.N.M. 2012) (holding estate was bound by arbitration agreement signed by person to whom nursing home resident gave powers under a power of attorney and who signed arbitration agreement at same time she signed admission paperwork because person had actual and apparent authority to act for resident; and in dicta, concluding resident was third-party beneficiary bound by its terms); *Patton*, 2012 WL 112216, at *1, 7-10 (concluding that where decedent's daughter signed admission agreement and arbitration agreement the same day decedent signed power of attorney designating his wife as agent and his daughter as alternate agent, and thereafter, her father was admitted into the facility where he received care for almost three years, decedent was third-party beneficiary to both admission and arbitration agreements).

The factual predicate of this case is different in important respects to require a different result from the above-cited district court cases. While the paperwork Ms. Burris signed clearly states an intent to make Ms. Rainwater a third-party beneficiary to the Arbitration Agreement, the record indicates that at the time of her admission into the facility Ms. Rainwater may have been able and willing to sign documents related to her own care. Rather than having Ms. Rainwater complete her own documents, the facility waited two weeks, when during that time, according to

the complaint, Ms. Rainwater "had a change in mental status and/or increased confusion" from on or around November 20, 2016 through November 24, 2016. State Court Compl. ¶ 47, ECF No. 1-4. The facility then presented the admissions paperwork, which included the Arbitration Agreement, to Ms. Burris, which occurred after many of the events that form the basis of liability in the state-court complaint.

When a federal court is faced with an unsettled question of state law, the court generally must try to predict how the highest court would decide the issue. *Belnap*, 844 F.3d at 1295. The New Mexico appellate courts have yet to apply the third-party beneficiary doctrine in a manner that requires the non-signatory to be bound, against her wishes, to the contract she did not sign. The lack of cited *appellate* authority (in this jurisdiction or others) that calls for application of this doctrine under the circumstances of this case gives this Court considerable pause in expanding the doctrine. The Tenth Circuit has cautioned that it is not the place of a federal court to expand state law beyond the bounds set by the state supreme court. *Id.* A federal court should generally be reticent to expand state law without clear guidance from the state's higher courts. *See Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993).

Casa Arena has not cited a decision by the New Mexico Supreme Court or New Mexico Court of Appeals allowing a signatory to a contract to enforce an arbitration agreement against a non-signatory to the contract. Most of the district court cases rely on the *Patton* case, which was decided before other state courts, such as Florida, have declined to extend the third-party beneficiary doctrine to cases like this one. Under the circumstances here where Ms. Burris signed the Arbitration Agreement weeks after Ms. Rainwater's admission to the facility, when Ms. Rainwater may have had the competence and ability to sign her own admissions paperwork at the time she entered the facility and for nearly two weeks afterwards, where there is a lack of apparent

or actual authority for Ms. Burris to sign documents on Ms. Rainwater's behalf, and when her Estate is not bringing claims under the contract itself, it is not clear that the New Mexico courts would compel Ms. Rainwater to arbitrate under the third-party beneficiary doctrine. Because the Court predicts that the New Mexico Supreme Court would not expand the doctrine to the circumstances here based on the current record, Casa Arena has not met its burden of showing its entitlement to compel arbitration under the third-party beneficiary doctrine.

### 2.  Equitable estoppel

Under New Mexico law, equitable estoppel "is the preclusion, by acts or conduct, from asserting a right which might otherwise have existed, to the detriment and prejudice of another, who, in reliance on such acts and conduct, has acted thereon." *Brown v. Taylor*, 1995-NMSC-050, ¶ 10, 901 P.2d 720 (internal quotations omitted). To establish waiver by estoppel, the party asserting the doctrine must show that (1) the party to be estopped made a misleading representation by conduct; (2) the party claiming estoppel had an honest and reasonable belief based on that conduct that the party to be estopped would not assert a certain right under the contract; and (3) the party claiming estoppel acted in reliance on the conduct to its detriment or prejudice. *Id.*

Plaintiff has not shown that the decedent or her estate made misleading representations by conduct. Unlike cases in which the decedent gave verbal assent to her family member to sign for him or her or was present and acted as if the family member could sign for her, here there is no evidence of such conduct by Ms. Rainwater. Moreover, this is not a situation where the resident received the benefit of significant care from the facility and the facility took that acceptance of care as a representation that the resident had accepted all contents of the admissions agreement. Plaintiff admitted Ms. Rainwater when she may have been competent to sign paperwork on her own behalf, yet Plaintiff did not present the paperwork for nearly two weeks to her daughter, who

did not have a power of attorney. Plaintiff thus waited to present the arbitration agreement at a time when Ms. Rainwater was possibly no longer mentally acute enough to sign on her own behalf. Ms. Rainwater left the facility merely three days after Ms. Burris signed the arbitration agreement, which was within the period in which Ms. Burris could have (but did not) repudiate the agreement. These facts do not establish that Ms. Rainwater or her estate acted misleadingly or that Plaintiff acted in reliance on the arbitration agreement to its detriment. These facts distinguish this case from cases in which courts have applied the equitable estoppel doctrine. *Cf. Moreno*, 277 F.Supp.3d at 1233-34 (applying equitable estoppel where resident received care at nursing facility for 18 months without her or her guardian challenging arbitration agreement, which was misleading conduct if resident did not intend to be bound by the agreement, and where nursing facility had honest and reasonable belief that the terms bound resident and her successors and nursing facility relied to its detriment by providing services to resident); *THI of S.C. at Columbia, LLC v. Wiggins*, C/A No. 3:11-888-CMC, 2011 WL 4089435, at *6 (concluding that where nursing facility performed in reliance on terms of contract signed by facility and resident's immediate family and resident received the benefit of contract "for an extended period of time," it would be inequitable for resident's estate to avoid contract's arbitration provision). Accordingly, Plaintiff has not met its burden of showing equitable estoppel principles apply under the circumstances here.

## V.     CONCLUSION

This Court has the authority under the FAA to determine the threshold question of whether a contract to arbitrate exists between the parties. Having considered the language of the Arbitration Agreement and the facts construed in favor of Defendant, the non-moving party, the Court concludes that questions of fact preclude this Court from finding that the Estate is bound by an

arbitration agreement signed by Ms. Burris and Casa Arena. This Court will therefore permit discovery to proceed on this issue over which the Court, and not the arbitrator, may decide.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion to Compel Arbitration* (**ECF No. 3**) is **DENIED**. The Court will leave issues concerning the need and scope of discovery to the Honorable Steven C. Yarbrough.

_____
SENIOR UNITED STATES DISTRICT JUDGE